IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAPITAL SOURCE FINANCE, LLC

    v.                 : Civil Action No. DKC 2006-2706

DELCO OIL, INC., *et al.*

## MEMORANDUM OPINION

Presently pending and ready for resolution in this case, which arises from the alleged breach of a loan agreement, is the motion by Plaintiff Capital Source Finance, LLC for an order to show cause why Defendants Stephen B. DeLuca, Richard R. Thames, and Stutsman Thames & Markey, P.A. ("Stutsman") should not be found in contempt of the court's Temporary Restraining Order signed October 16, 2006 ("the TRO").[1]  (Paper 17).  For the reasons set forth below, the motion will be granted and an evidentiary hearing will be held to resolve factual disputes raised by the parties with respect to this motion.

The background of this case is briefly summarized below, based on Plaintiff's allegations.  This case arises from a loan contract between Delco Oil, Inc. ("Delco") and Plaintiff (the "Loan Agreement").  Under the interpretation of the Loan Agreement

---

[1] Motions to dismiss or to transfer this case to the United States District Court for the Middle District of Florida have also been filed by Defendants Stephen DeLuca, Denise DeLuca, Richard Thames, Stutsman Thames & Markey, All-Star Sports Camp, DeLuca Properties, Inc., Gas Properties, Inc., and Steven J. Markus, Jr.  These motions will not be resolved in a separate memorandum opinion.

advanced by Plaintiff, the amount of Delco's revolving line of credit was capped based on a formula for Delco's "Cash Collateral" which included Delco's inventory and its accounts receivable. Delco pledged its Cash Collateral as collateral for the line of credit advanced under the Loan Agreement, and further agreed that payments made upon its accounts receivable would be immediately deposited in an account from which only Plaintiff could make withdrawals (the "Blocked Account"). Plaintiff claims that the documentation regarding Delco's Cash Collateral, upon which the amount of the loans made to Delco were based, was fraudulently inflated and that Delco breached the Loan Agreement by failing to deposit all payments on its accounts receivable into the Blocked Account. DeLuca is Delco's president and sole shareholder.

After the complaint and Plaintiff's motion for emergency relief were filed on October 16, 2006, Defendants' counsel were notified of the pending action and motion by Plaintiff's counsel, and counsel for both parties participated in a telephone conference with the court at 10:45 a.m.[2]  Thames represented Delco and DeLuca's interests during this telephone conference, arguing against entry of a TRO because it would inhibit the functioning of Delco's business, although he never formally entered an appearance

---

[2] The court's docket reflects that the telephone conference was held at 10:45 a.m., although both parties indicate that it started earlier, at approximately 10:30 a.m.  (Paper 29 ¶ 7; Paper 34, at 7-8).

in the case.  Before concluding the telephone conference, the court advised counsel for both parties that a TRO restricting the use of the Cash Collateral would be entered.

In issuing the TRO, the court found that Plaintiff would suffer irreparable harm if further funds paid on Delco's accounts receivable were diverted rather than being deposited in the Blocked Account, and concluded that Plaintiff's "claim to possession of its Cash Collateral is superior to Delco's claim thereto." (Paper 6, at 2).  Accordingly, the court, among other actions, enjoined:

> Delco, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise . . . from using, diverting, disposing, or otherwise taking any action with respect to CapitalSource's Cash Collateral other than depositing these funds in the Blocked Account.

(*Id.*).  The TRO was signed on October 16, 2006, at 11:45 a.m., and was thereafter entered on the docket for this case and transmitted to the parties.  DeLuca, Thames, and Stutsman do not contest that three wire transfers were authorized from a bank account in Delco's name on October 16, 2006, or that an additional series of transfers was authorized and completed over subsequent days before the TRO expired by its own terms.  Among the transfers on October 16 was a $100,000 transfer to Stutsman.

Plaintiff alleges that DeLuca, Thames, and Stutsman knowingly violated the TRO, and requests compensatory contempt sanctions

including attorney's fees.   Defendants argue that none of the transfers on October 16, 2006 violated the TRO because they allege these transfers were completed before the TRO was issued or before they had knowledge of the TRO, that the TRO was invalidated by Delco's bankruptcy filing on October 17, 2006, and that any violation of the TRO after that date was not a knowing violation. Thames and Stutsman also challenge the court's personal jurisdiction over them.

## I.   Standard of Review

Initially, it is necessary to distinguish whether contempt sanctions sought by a plaintiff are properly characterized as civil or criminal.   The label applied by the parties is not determinative.

> The basic difference between civil and criminal contempt sanctions is that civil contempt sanctions are intended 'to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained,' while criminal contempt sanctions are intended 'to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct. . . .'

*Bradley v. Am. Household, Inc.*, 378 F.3d 373, 378 (4th Cir. 2004) (quoting *Buffington v. Balt. County*, 913 F.2d 113, 133 (4th Cir. 1990)).

> To establish civil contempt, each of the following elements must be shown by clear and convincing evidence:
>
> (1) the existence of a valid decree of which the alleged contemnor had actual or

> constructive knowledge; (2) . . . that the
> decree was in the movant's "favor"; (3) . . .
> that the alleged contemnor by its conduct
> violated the terms of the decree, and had
> knowledge (at least constructive knowledge) of
> such violations; and (4) . . . that [the]
> movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (quoting

*Colonial Williamsburg Found. v. The Kittinger Co.*, 792 F.Supp.

1397, 1405-06 (E.D.Va. 1992), *aff'd*, 38 F.3d 133, 136 (4th Cir.

1994)).

> The discretion of the District Court in
> fashioning relief for civil contempt includes
> the right to order payment of attorney's fees
> as an element of civil contempt damages[, but]
> . . . [a] contemnor's refusal to comply with a
> Court Order must rise at least to the level of
> "obstinence   or   recalcitrance"   before
> attorney's fees can be ordered.

*Columbia Gas Transmission Corp. v. Mangione Enters. of Turf Valley,*

*L.P.*, 964 F.Supp. 199, 204 (D.Md. 1996) (citing *Folk v. Wallace*

*Bus. Forms, Inc.*, 394 F.2d 240, 244 (4th Cir. 1968); *Omega World*

*Travel, Inc. v. Omega Travel, Inc.*, 710 F.Supp. 169 (E.D.Va. 1989),

*aff'd*, 905 F.2d 1530 (4th Cir. 1990)).

## II. Personal Jurisdiction over Thames and Stutsman

## 1. Service of Process

Thames and Stutsman argue that they were not subject to this

court's personal jurisdiction at the time of the TRO hearing or the

alleged contempt, both because they lacked minimum contacts with

Maryland and because they were not defendants in the case and had

5

not been served with process as provided by Fed.R.Civ.P. 4(e).  It is unclear whether or not Thames and Stutsman argue that they were not properly served with notice of this contempt proceeding, but service pursuant to Fed.R.Civ.P. 4 was not necessary to initiate the contempt proceedings under the circumstances of this case. Although Stutsman and Thames were not parties to this action at the time of the TRO proceeding, they were added as Defendants and served prior to the time Plaintiff's contempt motion was filed.

Service of process consisting of a summons is generally a necessary step in exercising personal jurisdiction over any defendant, pursuant to Fed.R.Civ.P. 4(k)(1), which provides that "[s]ervice of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant . . . who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located . . . ."

> [W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, that party must be served with process as in any other civil action.  Process can be served only within the state in which the court is sitting, except when service beyond the state is authorized by Rule 4.

11A Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure*, § 2960 at 377 & nn.44-45 (2d ed. 1995) (footnotes omitted in quotation).  Service of process consisting of

6

a motion seeking contempt sanctions is not necessary to create
personal jurisdiction over a party already served with a summons.
*See*, *id*. at 376-77 & n.42.

Thames admits in his verified response to the show cause
motion that he was served with a summons and a copy of the amended
complaint, which added Thames, Stutsman, and others as Defendants,
on October 30, 2006. (Paper 29, at 9). Plaintiff's motion for an
order to show cause (paper 17) was filed shortly thereafter, on
November 8, 2006. Because Thames and Stutsman had been served with
process regarding the amended complaint, service of the contempt
papers was not a prerequisite to the court's exercise of personal
jurisdiction. *See* 11A Charles Alan Wright, Arthur R. Miller, &
Mary K. Kane, *Federal Practice and Procedure*, § 2960, at 376-77 &
n.42.

## 2. Minimum Contacts

Thames and Stutsman also argue that this court cannot properly
exercise personal jurisdiction over them for purposes of any
contempt proceedings because they lack minimum contacts with
Maryland. Plaintiff contends that separate minimum contacts with
Maryland are not required for this court to exercise personal
jurisdiction over Defendants with respect to any contempt
proceedings. While the United States Court of Appeals for the
Fourth Circuit does not appear to have addressed the issue, other
courts have held that, at least within the United States,

7

> [n]onparties who reside outside the territorial jurisdiction of a district court may be subject to that court's [personal] jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum.

*Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir.), *reh'g denied*, 770 F.2d 1081 (5th Cir. 1985), *cert. denied*, 474 U.S. 1056 (1986); *see also, e.g.*, *United States v. Barnette*, 129 F.3d 1179, 1185 n.10 (11th Cir. 1997); *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1391-92 (9th Cir.) (concurring with this formulation but declining to extend its application to individuals outside the United States), *cert. denied*, 516 U.S. 908 (1995).

Even if separate personal contacts were required, Plaintiff has made out a *prima facie* showing as to the basis for the exercise of personal jurisdiction based on Thames's and Stutsman's contacts with Maryland.[3]   A federal district court may exercise personal jurisdiction over a nonresident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993).   The Court of Appeals of Maryland has "consistently

---

[3]   Although Plaintiff did not articulate the basis for personal jurisdiction over Thames and Stutsman in its briefing with respect to the show cause motion, Plaintiff has made this argument in response to the motion by Thames and Stutsman to dismiss the amended complaint due to lack of personal jurisdiction.

held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15 (2005). Yet, courts may not "simply dispense with analysis under the long-arm statute," but rather, must interpret it "to the limits permitted by the Due Process Clause when [they] can do so consistently with the canons of statutory construction." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006).

Maryland's statute provides in part:

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
>
>> (1) Transacts any business or performs any character of work or service in the State; . . .

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b). There is a limiting condition in subsection (a): "If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section."

Plaintiff asserts that personal jurisdiction is proper over Defendants based on § 6-103(b)(1). Transacting business pursuant to subsection (b)(1) "requires 'actions [that] culminate in purposeful activity within the state.'" *Bahn v. Chi. Motor Club Ins. Co.*, 98 Md.App. 559, 568 (1993); *Prince v. Illien Adoptions Int'l, Ltd.*, 806 F.Supp. 1225, 1228 (D.Md. 1992); *Sleph v. Radtke*, 76 Md.App. 418, 427 (1988), *cert. denied*, 314 Md. 193 (1988).

Subsection (b)(1) does not require the defendant to have been present physically in Maryland.  *See Bahn*, 98 Md.App. at 568 (stating that under this subsection "[t]he defendant need never have been physically present in the state"); *Sleph*, 76 Md.App. at 427 (stating that a "nonresident who has never entered the State . . . may be deemed to have 'transacted business' in the State within the meaning of subsection (b)(1) as long as his or her actions culminate in 'purposeful activity' within the State").

The exercise of personal jurisdiction over a nonresident "depends on whether the defendant's contacts with the forum state provide the basis for the suit."  *See Mitrano v. Hawes*, 377 F.3d 402, 406-07 (4th Cir. 2004) (citing *Carefirst of Md. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 397 (4th Cir. 2003)).  Where, as here, the plaintiff contends that personal jurisdiction is proper based on specific jurisdiction, the court must examine "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003).  Furthermore, "[a] defendant should be able to anticipate being sued in a court that can exercise personal jurisdiction over him; thus, to justify such an exercise of

10

jurisdiction, a defendant's actions must have been 'directed at the forum state in more than a random, fortuitous, or attenuated way.'" *Mitrano*, 377 F.3d at 407 (quoting *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)).

The first factor, purposeful availment, is satisfied where a nonresident defendant purposefully has engaged in significant activities within the forum state or has created "continuing obligations" with residents of the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The crucial issue is whether the defendant's contacts with the forum state of Maryland are substantial enough that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A defendant has fair warning that it might be subject to a forum's jurisdiction if it purposefully directs its activities at forum residents and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.*, 471 U.S. 462, 472 (1985) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

The exercise of personal jurisdiction over Thames and Stutsman is appropriate pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), because they conducted business in the state of Maryland. Defendants contend that any contact was too minimal to

11

serve as the basis of personal jurisdiction.  Thames and Stutsman
are generally engaged in the business of representing their
clients' interests.  Thames' representation and advocacy on behalf
of Delco and DeLuca before this court, even though brief and by
telephone, constitutes doing business within the state of Maryland,
even without physical presence in the state.  *See Bahn*, 98 Md.App.
at 568; *Sleph*, 76 Md.App. at 427.  Thames also asserts that he
participated in the telephone conference regarding the TRO only
reluctantly, and indicated at the time that the representation was
beyond the scope of his agreed-upon representation of Delco.
(Paper 29, at 10).  Nonetheless, Thames participated in the call,
arguing on behalf of DeLuca and Delco against imposition of the
TRO.  Moreover, the contempt proceedings initiated by Plaintiff
arise directly out of this representation, as required by Md. Code
Ann., Cts. & Jud. Proc. § 6-103(a).  The court notified Thames of
the TRO because he had represented DeLuca and Delco at the hearing,
and this notice is an essential element required for a finding of
civil contempt.  Plaintiff alleges that Thames participated in the
TRO hearing, gained notice of the TRO, and almost immediately
participated in a violation of the court's Order.

The exercise of personal jurisdiction over Thames and Stutsman
also would not violate Due Process.  Thames, and through his action
Stutsman, purposefully directed his representation of Delco and
DeLuca toward Maryland by participating in the telephone conference

before this court.   Through this action, he purposefully and knowingly availed himself, and his firm, of the privilege of doing business in this state and before this court.   In so doing, they either knew or should have known that they exposed themselves to the court's contempt power in the event they failed to abide by its orders.   As discussed above, this contempt action arises directly from Thames' representation of Delco and DeLuca, targeted at Maryland, and this conduct constitutes an adequate basis for the exercise of specific personal jurisdiction.

Finally, the exercise of personal jurisdiction over Thames and Stutsman for purposes of this contempt proceeding also conforms to the fundamental fairness prong of the due process analysis.   Under the circumstances, it is clear that Thames and Stutsman are able and willing to undertake litigation in this forum, because they did so, at least on a limited basis through their participation in the telephone conference.   Any inconvenience to Thames and Stutsman arising from having to litigate this contempt proceeding in a distant forum is outweighed by the court's strong interest in requiring compliance with its own orders and by the burdens on the justice system overall if knowing disregard of a court order were not sanctionable by contempt even for nonresidents lacking other contacts with the forum state.   *See Waffenschmidt*, 763 F.2d 711, 721-22 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

III.  **October 16, 2006 Transfers**

Plaintiff claims that DeLuca, on Delco's behalf, initiated a series of wire transactions on October 16, 2006, that transferred funds traceable to accounts receivable payments included as Cash Collateral under the Lending Agreement to third parties and to Stutsman in violation of the TRO.  DeLuca acknowledges that three wire transfers were initiated from a bank account in Delco's name at Mainstreet Bank, located in Deland, Florida, on October 16, 2006.  These included a transfer to Stutsman in the amount of $100,000, a transfer to Lumbra Robinson Agency in the amount of $128,134, and a transfer to Rozier Oil Company in the amount of $72,000.[4]  (Paper 28, at 2-3).

Defendants do not contest that the TRO was an Order in Plaintiff's favor, but they do contest the other three elements of civil contempt.  As to the first element, the existence and knowledge of a valid order, Thames and Stutsman contest the validity of the TRO as to them, asserting that the court did not have personal jurisdiction over them at the time the TRO was issued.  Thames and Stutsman cite no authority for the proposition that an otherwise valid court order cannot be the basis for holding a third party in contempt for the knowing violation of that order because the court did not have personal jurisdiction over the third

---

[4]  Thames indicates that this last transfer was delayed and was later refunded because "they had put the brakes on."  (Paper 34, Ex. G, Thames Dep., at 56).

14

party at the time it was issued.  Instead, courts have held that a
third party may be subject to personal jurisdiction for contempt
for knowingly aiding and abetting the violation of a court order,
even without other contacts with the forum state. *Waffenschmidt*,
763 F.2d at 714; *Barnette*, 129 F.3d at 1185 n.10.  Thames and
Stutsman concede that cases have reached these holdings, but
contend that Plaintiff has not alleged that they aided and abetted
the violation of the TRO.  (Paper 29, at 11 n.6).  Plaintiff,
however, has alleged that Thames and Stutsman both advised and
assisted with post-bankruptcy transfers and that they accepted and
later used a transfer of funds on October 16, 2006, while knowing
the TRO prohibited Delco and its agents and attorneys from
transferring or using these funds.  In *Waffenschmidt*, the court
held that a third party could be held in contempt, despite a lack
of other contacts with the forum state, for accepting a transfer of
money from someone he knew had been enjoined from transferring
those funds. *Waffenschmidt*, 763 F.2d at 723.

DeLuca does not contest the validity of the TRO on October 16,
2006, but there is a dispute of fact as to when each Defendant
should be charged with  actual or constructive knowledge of the
TRO.  DeLuca stated in his declaration that he did not become aware
of the TRO until 1:22 p.m. on October 16, when he acknowledges he
received a faxed copy of the TRO.  Thames stated in his verified
response that he did not become aware that the TRO had been issued

until he "returned from lunch at approximately 1:15 p.m. and saw the e-mail from the Court transmitting the TRO (sent at 12:52 p.m.)." (Paper 29, at 7). He also acknowledged that he could have received a faxed copy of the TRO earlier than 12:52 p.m., but has not found and does not remember the fax and would not have looked at it until after he returned from lunch at 1:15 p.m. (Paper 29, at 4 n.2). Thames has since filed an amended affidavit, stating,

> I recently discovered that a prior e-mail from the Court, sent at 12:12 p.m., included the Docket Text (but did not contain the TRO). It appears that I opened the 12:12 p.m. e-mail around 12:37 p.m., as I immediately requested that the e-mail with attachments be resent. The time of my first viewing of the TRO remains correctly stated (approximately 1:15 p.m.) based on the timing of my immediate transmittal of the TRO to Mr. Deluca, of which I am certain.

(Paper 36, at 1-2). The text of the docket entry, which Thames indicates he received at 12:12 p.m. and read at 12:37 p.m., describes the TRO as follows:

> TEMPORARY RESTRAINING ORDER enjoining Delco from using, diverting, disposing or otherwise taking action with respect to CapitalSource's Cash Collateral, Delco shall cease removal of inventory, except for sales, enjoining Delco from advising customers to direct funds to any account other than the Blocked Account, enjoining Delco from destroying any of its business records, directing that this order shall expire in 10 days, CapitalSource shall post a bond in the sum of $500,000.00, directing CapitalSource shall provide a copy of this order to defendants, and setting a hearing on the request of CapitalSource for 10/18/2006 at 5:00pm)(signed by Judge Deborah

16

K. Chasanow on 10/16/2006 at 11:45a.m.) (lad3,
Deputy Clerk) (Entered: 10/16/2006).

Plaintiff argues that Thames, DeLuca, or both, were aware of
the TRO at an earlier time. Any knowledge Thames had of the TRO
can also be imputed to DeLuca, because Thames represented DeLuca at
the TRO hearing. A party is considered to have notice of all the
facts of which his attorney had notice. *Vial v. Lappin*, No. 98-
7649, 178 F.3d 1288, 1999 WL 274109 (4th Cir. May 5, 1999)
(Unpublished Disposition) (citing *Link v. Wabash R.R. Co.*, 370 U.S.
626, 634 (1962) ("each party . . . is considered to have 'notice of
all facts, notice of which can be charged upon the attorney.'")
(quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879))).

Thames admits that "[t]here is no question that there was a
rush to beat the TRO[,]" but he claims that this rush was
successful, and thus no violation of the TRO occurred, because the
transfers were completed before he learned of the TRO. (Paper 29
at 7). He states that he first learned of the pendency of
Plaintiff's suit between 9:00 and 10:00 a.m. on October 16, when he
received a telephone call from Plaintiff's counsel. (Paper 29, at
2 ¶ 4). Thames contends that at this time he was under the
impression that the telephone hearing would concern a motion to
appoint a receiver (paper 29, at 2 ¶¶ 4-5), although he does not
contest that he had been informed by Plaintiff's counsel that the
hearing would concern a motion for a TRO. (Paper 34, Ex. G, Thames
Dep., at 32-33). Thames indicates that he called DeLuca

17

immediately after this call with Plaintiff's counsel to inform him of the conversation and to tell him that "if he intended to follow through with the company's contingency plans for filing a Chapter 11 petition, he would have to do so immediately and meet Stutsman Thames & Markey's demand for a $100,000 prepayment of Chapter 11 fees before any receiver was appointed." (Paper 29, at 3). Thames also sent DeLuca an email at 10:04 a.m. stating:

> CapitalSource apparently filed suit in federal court in Maryland and is going to be seeking a receiver for the business. There will likely be a hearing this morning.
>
> If we're going to file Ch.11, we're going to have to do so pronto. We need to be paid first though with immediately available funds ($100,000). If we don't get the funds before the receivership hearing, it'll have to come from a third party source.
>
> The alternative is to let a receiver take control of the business and run with it for a while.

(Paper 29, Ex. A.).[5] Thames' suggestion that DeLuca wire money immediately because he would not be able to do so if the motion was approved tends to show that he was already aware that the pending motion could lead to an order that would restrict the use of the Cash Collateral.

Thames participated in the telephone conference before this court regarding the TRO, which started at approximately 10:15 to

---

[5] Thames indicates that this exhibit contained additional text that has been redacted to protect privileged information. (Paper 29, at 2 ¶ 4).

10:30 a.m.   At the end of the telephone conference, Thames acknowledges that "the Court announced that it would be entering some sort of temporary restraining order." (Paper 29, at 3 ¶ 8). He contends, in his verified response, however, that at this time he did not have "any knowledge of the form of the proposed TRO or of any conditions which may be placed on the effectiveness of the TRO". (*Id.*).   Thames described his understanding of the TRO based on the telephone conference more fully during his deposition:

> Q:   You had informed Mr. DeLuca of the TRO orally prior to that time [12:21 or 12:22 p.m.] though, correct?
>
> A:   I told him that we had had a hearing and that the court would likely be granting one later that day.   I had no idea what the TRO would contain, whether we would be permitted to – we, Delco would be permitted to continue buying fuel or not, whether there was going to be a bond, I had no knowledge of any of that information, just that the court had said there was probably going to be -- she was inclined to grant the relief.

(Paper 34, Ex. G, Thames Dep., at 34-35).   It is unclear whether Thames knew at this point that the TRO would prohibit the transfers, or at least that it would prohibit the transfer to Stutsman, which was unambiguously unrelated to inventory purchases or a bond.   Thames also acknowledged that he called DeLuca after the telephone conference with the court and before he went to lunch and told him that a TRO would be entered.   (*Id.* at 33-34).

Defendants also contest the third element of civil contempt, arguing that they did not violate the terms of the TRO through the

October 16, 2006 transfers because those transfers were made before the TRO was issued.  This raises a second dispute of material fact, as to when on October 16, 2006 the transfers were authorized, when they were completed, and whether and when DeLuca took any additional action to confirm the transfers.  DeLuca stated in a declaration and in his deposition that he requested each of the wire transfers in person at Mainstreet Bank by 9:15 a.m. on October 16, and that neither he nor any other agent of Delco took any action with regard to these transfers after 9:15 a.m. that morning. (Paper 28, Ex. 1, DeLuca Decl., at 2 ¶ 4).  In his deposition, he further explained that, between 9:02 a.m. and 9:15 a.m., he went to the bank and completed one wire transfer, returned to Delco's offices to acquire and fill out appropriate forms for the other two transfers, and then returned to the bank in person at 9:15 to initiate those transfers.  (Paper 34, Ex. D, DeLuca Dep., at 73-74).

Thames indicates that he called and sent an email to DeLuca requesting the $100,000 transfer immediately after being notified of Plaintiff's suit and motion for a TRO between 9:00 and 10:00 a.m.  His email message, as noted above, was sent at 10:04 a.m. (Paper 29, Ex. A).  He spoke with DeLuca again at the end of the TRO teleconference (paper 34, Ex. G, Thames Dep., at 33-34), and DeLuca sent an email to Thames at 11:31 a.m. indicating that the $100,000 wire transfer that Thames had requested had been sent.

(Paper 29, Ex. C).   Thames also explains that the wire transfer from Delco was received by Stutsman's bank at 12:21 p.m.  (Paper 29, at 3 ¶ 9; *id.*, Ex. F).

Plaintiff contends that DeLuca's version of the events is not credible in light of the short time in which DeLuca claims to have made two trips to Mainstreet Bank.   Plaintiff also asserts that other evidence contradicts Thames's and DeLuca's statements, and that they contradict each other as to some details.   Plaintiff argues that DeLuca faxed the transfer requests to Mainstreet Bank rather than submitting them in person.   The wire transfer form authorizing the transfer of $100,000 from Delco to Stutsman indicates that it was transmitted by fax.  (Paper 17, Ex. B, at 1).  The wire transfer form for the Rozier Oil wire transfer also indicates that it was sent by fax, although it is dated October 17, 2006.  (*Id.*, Ex. D, at 1).   The wire transfer form for the Lumbra Robinson transfer, however, does not indicate how it was submitted. (*Id.*, Ex. C, at 1).   The deposition testimony of William Benjamin Flowers, Jr., President and CEO of Mainstreet Bank, confirms that the markings on the Rozier Oil and Stutsman wire transfer forms indicate that they were transmitted by fax.  (Paper 34, Ex. B, Flowers Dep., at 61, 68).   Plaintiff suggests that, because these forms indicate they were faxed but do not bear the usual transmission time and date stamp, this information may have been

intentionally suppressed or removed in order to hide the actual time that the transfer request form was sent.

Plaintiff has also forecast evidence tending to show that the transfers were confirmed by DeLuca and processed later than Defendants contend.  Mr. Flowers explained the process through which outgoing wire transfers are generally handled by Mainstreet Bank, although he noted some gaps in his knowledge of these policies.  The wire transfer request is confirmed by making a call to the account holder, and confirming the transaction with someone authorized to sign on the account.  Then the transfer is authorized by two bank officials, and transmitted by fax to North Star Financial Group, which creates an electronic request for the transaction.  This electronic request is again verified by Mainstreet Bank, and then the electronic transaction is processed by the Banker's Bank.  (Paper 34, Ex. B, Flowers Dep., at 43-52). Mr. Flowers indicated that the confirmation phone call to the account holder and the approval by bank officials are recorded on the wire transfer form.  (*Id.* at 47-50).  Mainstreet Bank's wire transfer request forms do include a space to record a time, on the right side of the bottom line of the form, but Mr. Flowers indicated that he did not know whether this time entry indicates the time at which the transaction was forwarded to North Star, or the time of an earlier or later approval within Mainstreet Bank. (*Id.* at 48-49, 51-52).

The records submitted by Plaintiff and reviewed with Mr. Flowers during his deposition indicate some information about the timing of events related to the wire transfers from Delco's Mainstreet Bank account initiated on October 16, 2006.  The wire transfer form for the $100,000 wire transfer to Stutsman indicates "Wire Confirmed With: Steve Deluca" and in the next entry indicates "Call Back Made By:  Nilda Reed." (Paper 17, Ex. B, at 1).  Mr. Flowers confirmed that these entries appear to indicate that a bank employee called DeLuca and that he personally confirmed the transfer at some time after the request was submitted.  (Paper 34, Ex. B, Flowers Dep., at 46-47).  The time entry on this wire transfer form is "11:39."[6]  (Paper 17, Ex. B, at 1).  Mainstreet Bank's records, which appear to relate to the electronic processing system referenced by Mr. Flowers, indicate that the wire transfer to Stutsman was "transferred" at 11:57 a.m. on October 16, 2006. (Paper 22, Ex. A).  The bank's records with respect to the $128,134 transfer to Lumbra Robinson Agency also indicates that "Steve DeLuca" was called back to confirm the transaction, and indicates that the call was made by "Betty Doyle." (Paper 17, Ex. C, at 2). This wire transfer form, however, does not include any notation of time.  (*Id.*).  Finally, the wire transfer form for the $72,000 transfer to Rozier Oil is dated October 17, 2006, although

---

[6]  It is unclear whether the time entry is designated as a.m. or p.m.  It appears that an "A" and a "P" were written one over the other on the form.

Defendants acknowledge that this transfer was initiated on October 16, and the form indicates a time of "8:00 a.m."  The Rozier Oil form also indicates that a confirmation call was made to "Steven DeLuca" by "Betty."  (*Id.*, Ex. D, at 1).

The dispute of fact as to this issue and the dispute of fact as to when Defendants should be charged with knowledge of the TRO requires resolution at an evidentiary hearing.  The earliest time Plaintiff asserts Defendants should be charged with notice of the TRO is before the time Plaintiff alleges Defendants each last actively participated in the transfers of funds.  Conversely, the latest notice time alleged by Defendants is after the time that Defendants assert that they completed all active participation in the funds transfers.  The timing of these events is material to the outcome on the motion, because it is likely to determine whether the prepetition transfers constituted a knowing violation of the TRO.

Defendants also argue, under the third element, that even if the transfers occurred after the TRO was issued, that they did not know of the TRO until after the transfers were completed.  This argument again relates to the factual disputes, discussed above, regarding when each of the parties became aware of the TRO and when the TRO was issued, which will be addressed at the evidentiary hearing.

Finally, DeLuca disputes the final element of civil contempt, contending that Plaintiff has suffered no harm from any of the October 16, 2006 transfers.  DeLuca argues that the transfers that were made from Delco's account at Mainstreet Bank were used to operate Delco's business, and that some of the transfers were used to purchase inventory.  Because Plaintiff holds a security interest in Delco's inventory and accounts receivable, he contends, Plaintiff has been automatically and fully made whole by the proceeds generated as Delco was operated and inventory was sold. Plaintiff argues that it has suffered harm because the challenged transfers exceed the revenue generated by Delco over this time period by approximately $2 million.  Because Plaintiff has not yet submitted evidence on this factual issue, it should be prepared to present evidence of harm at the evidentiary hearing that will be scheduled.

## IV.  Post-Petition Transfers

Plaintiff asserts that DeLuca, with Thames' assistance and advice, engaged in a series of subsequent wire transfers after a Chapter 11 bankruptcy petition on Delco's behalf was filed with the United States Bankruptcy Court for the Middle District of Florida on October 17, 2006.[7]  Plaintiff contends that these transfers were not authorized by the bankruptcy court and were in violation of the

---

[7]  The parties indicate that Delco's bankruptcy proceeding was subsequently converted to a liquidation proceeding under Chapter 7.

TRO. DeLuca admits that he authorized nine post-petition wire transfers on behalf of Delco, which resulted in the transfer of more than $1.2 million. (Paper 28, at 4). DeLuca does not address whether these transfers consisted of Plaintiff's Cash Collateral, although he conclusively asserts that the transfers involved exclusively property of the estate. DeLuca asserts that the contempt proceedings sought by Plaintiff are barred by statute, challenges the validity of the TRO after Delco's bankruptcy petition was filed, and asserts that he did not act with a state of mind that could give rise to civil contempt.

DeLuca asserts that Plaintiff's contempt motion is barred by the automatic stay of pending actions imposed at the time Delco's bankruptcy petition was filed pursuant to 11 U.S.C. § 362(a). Since the time the parties briefed these issues, the United States Bankruptcy Court for the Middle District of Florida has entered an Order lifting the automatic stay with respect to this litigation. *In re Delco Oil, Inc.*, No. 06-03241-GLP (Br.M.D.Fla. March 21, 2007) (filed in this action as Paper 65, Ex. A) ("The Automatic stay imposed by 11 U.S.C. §362 is lifted as to [Plaintiff], and [Plaintiff] may enforce its rights with respect to its Collateral and continue its prosecution of the Maryland Lawsuit."). The bankruptcy court acted pursuant to 11 U.S.C. § 362(d)(2), which authorizes lifting the automatic stay with respect to actions concerning property if "the debtor does not have an equity in such

property; and such property is not necessary to an effective reorganization." The bankruptcy court lifted the automatic stay with regard to funds in deposited at Mainstreet Bank because it concluded "that CapitalSource has sufficiently carried its burden of establishing that the pre-petition deposits into the Mainstreet Bank account constitute identifiable cash proceeds of collateral in which it holds a perfected security interest." *In re Delco Oil, Inc.*, No. 06-03241-GLP, at 6 (filed in this action as Paper 65, Ex. A).

Accordingly, it appears that the automatic stay presents no bar to the contempt proceedings Plaintiff seeks. Because DeLuca has not had the opportunity to be heard as to the effect of the bankruptcy court's Order lifting the automatic stay with respect to this litigation, however, the parties should be prepared to present any arguments regarding this issue at the evidentiary hearing that will be scheduled.

As to the first element of civil contempt, DeLuca argues that under 28 U.S.C. § 1334(e)(1), this court was divested of jurisdiction over all "property of the estate" and as a result, the TRO became invalid as of October 17, 2006. Pursuant to section 1334(e), "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction -- of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate. . . ."

This language, by vesting exclusive jurisdiction in the district where the bankruptcy is pending, divests all other courts of *in rem* jurisdiction over property that forms a part of the bankruptcy estate. *See Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 303 (4th Cir. 2001) (concluding that section 1334(e) provides exclusive *in rem* jurisdiction over estate property and thus divested another district court of jurisdiction to continue *in rem* receivership action over that property). The Supreme Court of the United States has also characterized 28 U.S.C. § 1334(e) as affecting *in rem* jurisdiction over the property of the bankruptcy estate. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447-48 (2004).

This action, and the TRO itself, is and was predicated on *in personam* jurisdiction over DeLuca, Delco, and the other Defendants added by Plaintiff's amended complaint, and is not based on *in rem* jurisdiction.[8] Defendants argue that the action, and particularly the TRO, had an effect upon Delco's assets, the Cash Collateral, which became property of its bankruptcy estate when its bankruptcy petition was filed on October 17, 2006. They contend that as a result, section 1334 divested this court of jurisdiction over the case, thus invalidating the TRO as of October 17, 2006. This argument, however, is inconsistent with the plain meaning of

---

[8] As discussed above, Thames and Stutsman contend that they are not subject to this court's personal jurisdiction.

28

section 1334.   Section 1334(e)(1) provides exclusive *in rem* jurisdiction for the district court where a bankruptcy is pending, but does not speak to *in personam* jurisdiction over a bankruptcy debtor or its officers.   Defendants argue that this interpretation of section 1334 deprives the automatic stay, provided in 11 U.S.C. § 362(a) of meaning, but the language of section 362(a)(1) casts a much broader net, and automatically stays any action even if its is based on *in personam* jurisdiction over the debtor.   *See* 11 U.S.C. § 362(a)(1) (requiring stay of any "judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.")   The significant difference in the scope of the language used by these statutory provisions provides further support that section 1334(e) does not divest this court of *in personam* jurisdiction over an action with some relation to Delco and its property.

Defendants all rely on an unreported decision, *In re Action Redi-Mix Corp.*, No. 03-Civ-9583-LBS, 2005 WL 1337259 (S.D.N.Y. June 7, 2005), *aff'd*, 175 F.App'x 484 (2^d Cir. 2006), for the proposition that a bankruptcy filing automatically dissolves a pre-petition injunction restricting the use of assets in the hands of a debtor.   *In re Action Redi-Mix Corp.*, however, does not stand for this proposition, but instead confirms that the automatic stay, and

not section 1334, is the relevant frame for this analysis.   The
district court in that case affirmed several determinations made by
the bankruptcy court.   Prior to the debtor's bankruptcy filing, a
creditor had obtained a temporary restraining order against the
debtor's use of nine cement mixers over which the creditor asserted
a secured lien.   *Id.* at *1.   After filing a bankruptcy petition,
the debtor moved before the bankruptcy court for an Order
authorizing use of the cement mixers in spite of the preliminary
injunction, and the bankruptcy court granted this motion.   *Id*.   The
creditor later moved the bankruptcy court to lift the automatic
stay to allow a contempt action to enforce the temporary
restraining order.   The bankruptcy court denied this motion, and
the creditor appealed to the district court.   *Id*.   The district
court held that the bankruptcy court did not abuse its discretion
when it determined not to lift the automatic stay or when it
determined that it should allow the debtor to use the cement
mixers, based on a finding that the cement mixers were property of
the estate.   *Id.* at *3.

The court did not hold, however, that a contrary decision, to
lift the stay and allow a contempt proceeding would not have been
appropriate if the bankruptcy court had deemed such an action
justified under 11 U.S.C. § 362.   Indeed, the court cited a
previous opinion where the bankruptcy court had determined that a
debtor's claims to property were meritless and therefore lifted the

automatic stay to allow contempt proceedings for violations of the preliminary injunction. *Id.* (citing *Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp. (In re Rudaw/Empirical Software Prods. Ltd.)*, 83 B.R. 241 (Bankr.S.D.N.Y. 1988)).  The Delco bankruptcy court has determined that Delco had no equity in the funds in the Mainstreet Bank account from which the challenged transfers were made, and as a result it lifted the automatic stay with respect to this litigation. *In re Delco Oil, Inc.*, No. 06-03241-GLP, at 2, 6, 8 (filed in this action as Paper 65, Ex. A). Defendants also appear to have moved the bankruptcy court for permission to use funds representing the Cash Collateral, and Plaintiff indicates that this motion was denied.  Thus, it does not appear that any action of the bankruptcy court in Delco's bankruptcy had the effect of overriding or otherwise invalidating the TRO.

Thames and Stutsman note with regard to this court's jurisdiction over this contempt proceeding, that Plaintiff filed before the bankruptcy court on October 27, 2006 a motion seeking disgorgement by Stutsman of the $100,000 transferred by Delco on October 16, 2006.  (Paper 29, at 9 n.3; *id.* Ex. G).  It appears that although the motion made the bankruptcy court aware of this court's TRO, it was grounded in bankruptcy law and was distinct in reasoning from Plaintiff's present civil contempt motion.  While the outcome of this motion may be relevant to the present

proceeding in determining the appropriate level of any compensatory civil contempt damages, and could potentially raise preclusion issues if it was actually litigated, it is not clear what has transpired before the bankruptcy court with regard to this motion since the parties' briefs were filed.  As a result, the parties should be prepared to address any issues related to the motion made before the bankruptcy court at the evidentiary hearing that will be scheduled.

Defendants do not contest that they were aware of the TRO by sometime on October 16, 2006, that the TRO was in Plaintiff's favor, or that the post-petition transfers violate the terms of the TRO.  Defendants contend that they did not believe that they were violating the TRO, because they believed that it had been invalidated by Delco's bankruptcy filing.

DeLuca contends that he believed that the TRO had been invalidated by 28 U.S.C. § 1334(e), and that he believed he was acting under authorization of an Order of the bankruptcy court which he understood to supersede the TRO, and as a result lacked the knowing state of mind required for civil contempt with respect to the post-petition transactions.  It is also clear from the record, however, that DeLuca was aware of the TRO on October 16, 2006, and the TRO's text is clear in its prohibition of any transaction utilizing Plaintiff's Cash Collateral.  Thus, there is

a question of fact as to DeLuca's state of mind at the time of the post-petition transfers.

Thames and Stutsman also argue that they did not knowingly violate the TRO, as would be required for civil contempt, because they honestly believed, before expending any of the $100,000 transfer, that use of the funds was authorized by virtue of having filed the bankruptcy petition.  They argue that this payment was a prepayment of fees related to Delco's bankruptcy filing, that the right to any return of these fees became the property of Delco's bankruptcy estate after Delco's bankruptcy petition was filed, and thus that when DeLuca, as a representative of Delco as a debtor-in-possession authorized them to use the fees, such authorization was effective in spite of this court's TRO.  Thames and Stutsman also state that they relied in reaching this conclusion on *In re Craig*, 265 B.R. 624 (Bankr.M.D.Fla. 2001), and that even if that reliance was misplaced, this reasoning precludes a finding of a knowing violation fo the TRO as would be required to establish civil contempt.

The *In re Craig* court determined that under Florida law, a pre-petition, nonrefundable earned-on-receipt retainer paid to an attorney by a debtor remains refundable, and hence the equitable interest in a potential refund is property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541. *Id.*, at 629-30. *In re Craig* does not address the continuing effect of a pre-

33

petition Order of another court exercising *in personam* jurisdiction
to enjoin the use of certain funds in the debtor's possession.
Thames and Stutsman argue that they believed the TRO was no longer
in effect with respect to the transferred funds once Delco's
bankruptcy petition was filed, because the funds constituted
property of Delco's bankruptcy estate under the reasoning of *In re
Craig*.

At the least, this rationale would not excuse Thames and
Stutsman from any role in accepting or participating in the
transfer on October 16, 2006, if the transfer occurred after the
TRO was issued and hence was in violation of the TRO.  Furthermore,
Thames has admitted that he participated in a rush to obtain the
transfer before the TRO was issued (paper 29, at 7), which tends to
show that he intended to thwart the goals advanced by the TRO.
Moreover, this admission tends to show that Thames knew that the
transfer involved Cash Collateral, the use of which the court had
announced it would enjoin.  Finally, because there is evidence that
Thames and Stutsman knew that the wire transfer to them was derived
from Plaintiff's Cash Collateral there is at least some support for
an inference that they should have expected the bankruptcy court to
lift the automatic stay pursuant to 11 U.S.C. § 362(d)(2) and allow
a contempt proceeding to enforce the TRO.  Based on these facts and
Thames's asserted reliance on *In re Craig*, a question of fact
remains as to the states of mind of Thames and Stutsman when they

chose to accept, retain, and use the transferred funds.  The parties should be prepared to address this issue at the evidentiary hearing.

## V.  Retention of Funds

Plaintiff contends that DeLuca violated the TRO by retaining funds traceable to Cash Collateral including payments on Delco's accounts receivable in the Mainstreet Bank account without depositing those funds in the Blocked Account immediately upon notification of the TRO.  This argument, however, is not supported by the text of the TRO.  The TRO enjoined Defendants and Delco from "using, diverting, disposing, or otherwise taking any action with respect to CapitalSource's Cash Collateral other than depositing these funds in the Blocked Account[.]"  It did not explicitly direct Delco or its agents to take affirmative action to deposit any funds into the Blocked Account, in part because the court was not aware at the time that the TRO was issued that Delco possessed any funds in other accounts.  Because the language of the TRO did not explicitly require affirmative action to deposit funds derived from the Cash Collateral into the Blocked Account, the failure to do so cannot constitute an actual violation of the TRO.  There is nothing to suggest that Defendants acted with the knowledge that would be necessary to support civil contempt because the TRO did not clearly require any funds to be deposited into the Blocked Account.  *See Ashcraft*, 218 F.3d at 301.

35

## VI.   Attorney's Fees

Plaintiff also seeks compensation for its attorney's fees in this matter as part of a compensatory sanction for civil contempt. As discussed above, Thames and Stutsman argue that any violation of the TRO was not knowing, because they relied on case law from the Bankruptcy Court for the Middle District of Florida, that they understood to indicate that they were authorized to utilize the transfer made by DeLuca on Delco's behalf as prepayment of their fees for services related to Delco's bankruptcy case.   Thames and Stutsman further argue that, even if they knowingly violated the TRO, because they allegedly acted in good faith reliance on *In re Craig*, they were not obstinate or recalcitrant in refusing to comply with the TRO, as would be required to support an award of attorney's fees for civil contempt.   *Columbia Gas Transmission Corp.*, 964 F.Supp. at 204.   As discussed above, the mental state of Thames and Stutsman is a factual issue that must be resolved at the evidentiary hearing, and the related issue of recalcitrance will likewise depend on this question of fact.   As such, all parties should be prepared to address this issue at the evidentiary hearing that will be scheduled.

## VII.  Conclusion

For the foregoing reasons, the motion for a show cause hearing will be granted and the parties will be directed to appear before

the court for an evidentiary hearing to resolve the remaining factual questions.   A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge